**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABID SYED, *et al.*,<br><br>Defendants. | Case No. 2:22-cr-00818 (BRM)<br><br>**OPINION** |

MARTINOTTI, DISTRICT JUDGE

     Before the Court are several pre-trial Motions by three out of four individuals, Muhammad Aurangzeb ("Aurangzeb"), Tariq Din ("Din"), Abid Syed ("Syed") (collectively, "Defendants"), and David Weathers ("Weathers"), in response to an Indictment (ECF No. 94) ("Indictment") charging them with one count of conspiracy to violate the federal Anti-Kickback Statute ("AKS") in violation of 18 U.S.C. § 371. First, Din, joined by Syed, moves to dismiss the Indictment. (ECF No. 177.)[1] Din, joined by Syed, also filed an Omnibus Motion (ECF No. 178)[2] requesting: (1) an evidentiary hearing regarding the admissibility of audio recordings; (2) a severance of his trial from that of Aurangzeb's; (3) a bill of particulars; (4) the striking of certain surplusage; (5) the suppression of allegedly improper grand jury evidence, the production of all relevant documents and materials under Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 404(b), *Brady*, *Giglio*, and the Jencks Act at appropriate times, as well as an order that the Government

---

[1] Din's Motion to Dismiss is posted under two docket numbers. It was originally posted in an unsealed, redacted form (ECF No. 174) and later filed as sealed and unredacted (ECF No. 177).
[2] Din's Omnibus Motion is posted under two docket numbers. It was originally posted in an unsealed, redacted form (ECF No. 169) and later uploaded sealed and unredacted (ECF No. 178).

preserve all agents' rough notes; (6) an order that the Government promptly disclose expert witnesses; (7) leave to join in co-defendants' motions not inconsistent with his own[3]; and (8) leave to file additional motions as necessary. Next, Syed filed a Request for a *Franks* Hearing (ECF No. 170), and a Motion to Compel the Government to produce the grand jury transcripts and all evidence under *Brady* and *Giglio* related to the exoneration of the dismissed defendants (ECF No. 171). Aurangzeb also filed an Omnibus Motion (ECF No. 173) requesting: (1) the dismissal of the Indictment; (2) a severance of Aurangzeb's trial from that of co-defendants Syed and Din; (3) a hearing to determine the admissibility of any co-conspirator statements; (4) an order for the Government to disclose all exculpatory evidence; (5) an order for the Government to describe any Rule 404(b) evidence it intends to introduce at trial; (6) an order compelling disclosure of all relevant information concerning all witnesses, informants, and cooperators; (7) a hearing regarding the audibility and admissibility of any tape or video recordings; (8) an order that the Government preserve all rough notes created in the course of its investigation; and (9) leave to file additional motions as necessary.

The Government filed a brief in opposition to Defendants' Motions (ECF No. 184) on July 1, 2024. On August 29, 2024, Din and Syed filed briefs in reply (ECF Nos. 191–92, 193 respectively), and Aurangzeb filed his reply on August 30, 2024 (ECF No. 194). Having reviewed the submissions filed in connection with the Motions and having held oral argument pursuant to Local Civil Rule 78.1, applicable to criminal cases under Local Criminal Rule 1.1, for the reasons set forth below and for good cause having been shown, Defendants' Motions (ECF Nos. 170–71, 173, 177–78) are **GRANTED** in part and **DENIED** in part.

---

[3] Din, joined by Syed, requests permission to join in the motions of other co-defendants to the extent the co-defendants' motions are not inconsistent with his own motions. (ECF No. 178 at 46.) Din's request is granted.

I.    BACKGROUND

A.  Factual Background

A federal grand jury returned an Indictment of Defendants and Weathers on December 6, 2022. (ECF No. 94.) The Indictment charged Defendants and Weathers with one count of conspiracy to violate the AKS. (*Id.* at 12.) The Indictment is based on events from in or about April 2021 to in or about April 2022 during the 2019 Coronavirus ("COVID-19") pandemic. (*Id.* at 5.) The Indictment stems from a law enforcement investigation into an alleged conspiracy between Defendants to unlawfully pay and receive bribes and kickbacks for the collection of COVID-19 test samples directed to Metpath Laboratories, Inc. ("Metpath"), a clinical laboratory that conducted testing to detect the presence of COVID-19 in samples taken from individual patients. (*Id.* at 1.) Syed and Din operated and controlled Metpath together. (*Id.*) Aurangzeb, a marketer for Metpath, owned and operated Maximum Revenue Business Solutions LLC ("Maximum Business"), and Weathers, also a Metpath marketer, owned and operated MedtechCares, a New York-based company that connected individuals to COVID-19 testing services. (*Id.* at 1–2.) A fifth unnamed individual ("Individual-1") not charged in the Indictment was a co-conspirator, who also served as a marketer for Metpath. (*Id.*)

Metpath operated daily for twenty-four hours per day providing COVID-19 testing during parts of the pandemic, occasionally being forced to turn away additional business because it was so busy. (ECF No. 177 at 11.) At that time, the U.S. Department of Health and Human Services ("HHS") urged regular testing, regardless of whether a person was experiencing symptoms. (*Id.*) On September 4, the Government allegedly stated:

> Testing of all people for SARS-CoV-2, including those who have no symptoms, who show symptoms of infections such as trouble breathing, fever, sore throat or loss of the sense of smell and taste, and who may have been exposed to the virus will help prevent the

> spread of COVID-19 by identifying people who are in need of care
> in a timely fashion.

(*Id.* at 11–12.) There was, at that time, a considerable need for COVID-19 testing by schools, pharmacies, and other places. (*Id.* at 12.)

The Health Resources and Services Administration ("HRSA"), an agency within HHS, supported health care providers during the COVID-19 pandemic by reimbursing health care providers and facilities for testing, treatment, and vaccine administration for uninsured patients ("HRSA COVID-19 Uninsured Program"). (ECF No. 94 at 3.) Funding was provided through federal statutes such as the Families First Coronavirus Response Act and the Paycheck Protection Program and Health Care Enhancement Act, which appropriated $2 billion in reimbursements for providers conducting testing and services for uninsured patients. (*Id.*) Qualifying providers submitted insurance claims for uninsured patients receiving COVID-19 health care and treatment to Medicare, other federal insurance programs, or private insurance companies. (*Id.* at 4.)

Furthermore, during the COVID-19 pandemic, the Office of Inspector General ("OIG") allegedly issued policy statements and frequently asked questions ("FAQ") calling for "regulatory flexibility necessary to adequately respond to COVID-19 concerns." (ECF No. 177 at 8.) Through these statements and FAQs, the OIG purportedly condoned conduct that might otherwise "violate the Federal anti-kickback statute on its face." (*Id.*) One part of the FAQ answered the question, "[c]an a clinical laboratory that bills Federal health care programs for laboratory tests to diagnose COVID-19 pay a retail pharmacy a fee for certain costs that the retail pharmacy incurs related to testing collection sites?" in the following terms:

> [W]e believe that the proposed arrangement between the clinical
> laboratory and retail pharmacy, in the context of the COVID-19
> public health emergency, would be sufficiently low risk under the
> following circumstances: (i) the retail pharmacy incurs costs in
> operating the testing collection sites; (ii) the payment is fair market

> value for the items and services furnished by the retail pharmacy running the sites; and (iii) the retail pharmacy is not submitting claims to Federal health care programs – or directly or indirectly receiving other Federal or State funding – that reimburse it, in whole or in part, for the items and services furnished by the retail pharmacy in running the sites for which the laboratory reimburses the pharmacy.

(*Id.* at 8–9 (citing Ex. 23 at 13).) Medicare and Medicaid allegedly later determined that $24 per test was an approximate fair market value. (*Id.* at 9.)

The Government alleges that Syed and Din paid marketers, including Aurangzeb and Weathers, kickbacks in exchange for referrals of COVID-19 test samples to Metpath. (ECF No. 94 at 6.) These kickback payments were calculated based on the number of COVID-19 test samples referred. (*Id.*) The alleged kickback payments follow a similar pattern of conduct between and amongst the Defendants. (*Id.*) For example, from in or about August 2021 to in or about April 2022, Syed, Din, and Aurangzeb allegedly agreed for Metpath, through Syed and Din, to pay Aurangzeb kickbacks for referring COVID-19 test samples to the company. (*Id.* at 9.) From in or about August 2021 to in or about September 2021, Aurangzeb purportedly caused roughly 502 COVID-19 test samples to be referred to Metpath. (*Id.*) On or about October 12, 2021, Maximum Business allegedly received a kickback payment of approximately $5,060.00 from Metpath as payment for Aurangzeb referring the 502 COVID-19 test samples. (*Id.*)

Syed and Din purportedly continued to recruit new marketers in addition to Weathers and Aurangzeb, including on or about January 20, 2022, when they allegedly spoke with a potential new marketer and negotiated a kickback payment amount. (*Id.* at 10.) As a result of this alleged conspiracy, the Government claims Metpath received more than $3.5 million in reimbursement payments from federal programs like Medicare and the HRSA COVID-19 Uninsured Program for test samples of COVID-19 referred to Metpath by Weathers and Aurangzeb. (*Id.*)

### B. Procedural History

On April 11, 2022, the Government filed a criminal complaint ("Complaint") against Syed, Din, and four other individuals—Tamer Mohamed, Abdul Rauf, Tauqir Khan, and Nisim Davydov—charging them with conspiracy to violate the AKS. (ECF No. 1.) On April 11 and 12, 2022, Syed (ECF Nos. 3, 9–11) and Din (ECF Nos. 12–13, 16–17) were arrested and released on bond subject to certain conditions.

On December 6, 2022, a grand jury returned the Indictment alleging conspiracy to violate the AKS by Syed and Din along with Weathers and Aurangzeb, substituting them for the four other individuals previously named in the criminal complaint. (ECF No. 94.) Syed and Din were arraigned on December 14, 2022, wherein they pled Not Guilty to Count I. (ECF Nos. 108, 110.) On December 7, 2022, Aurangzeb was arrested and released on bond subject to certain conditions. (ECF Nos. 93, 95–100.) He was arraigned on December 14, 2022, wherein he pled Not Guilty to Count I. (ECF No. 112.) Weathers was also arrested on December 7, 2022, and he was held in detention with the right to make a bail application at a later time. (ECF Nos. 100, 103–07.) He was arraigned on December 7, 2022, wherein he initially pled Not Guilty to Count I. (ECF No. 103.) On February 26, 2024, Weathers applied for permission to enter a guilty plea (ECF No. 160) and was adjudicated Guilty of Count I on March 11, 2022 (ECF No. 163).

On May 13, 2024, Defendants filed all five present motions.[4] (*See* ECF Nos. 170–71, 173, 177–78.) First, Din, joined by Syed, filed an Omnibus Motion requesting an evidentiary hearing, a bill of particulars, the striking of surplusage, the suppression and production of certain evidence, orders compelling the Government to preserve certain evidence and promptly disclose expert

---

[4] In a separate letter submitted by his counsel, Syed joins in Din's motions and adopts his arguments in full. (ECF No. 172.)

witnesses, and leave to file additional motions. (ECF No. 178.) Din, joined by Syed, also filed a

Motion to Dismiss the Indictment. (ECF No. 177.) Next, Syed filed a request for a *Franks* hearing

as well as a Motion to Compel certain evidence. (ECF Nos. 170–71.) Finally, Aurangzeb filed an

Omnibus Motion requesting the dismissal of the Indictment; a severance of his trial; hearings to

determine admissibility of certain evidence; orders from the Court that the Government preserve,

disclose, and/or describe exculpatory evidence, Rule 404(b) evidence, information concerning

witnesses, informants, and cooperators as well as notes created during the investigation, as

relevant; and leave to file additional motions as necessary. (ECF No. 173.)

The Government filed a brief in opposition to Defendants' Motions (ECF No. 184) on July

1, 2024. On July 29, 2024, Defendants filed a joint letter (ECF No. 187) requesting an extension

to file their replies, which the Court granted on July 30, 2024 (ECF No. 188). Syed filed a separate

letter (ECF No. 189) requesting an additional extension on August 23, 2024, which the Court

granted on August 26, 2024 (ECF No. 190). Din filed briefs in reply (ECF Nos. 191–92) and Syed

filed a reply brief (ECF No. 193), both on August 29, 2024, and Aurangzeb filed a reply (ECF No.

194) on August 30, 2024.

## II.    MOTION I – MOTION TO DISMISS

### A.  Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) provides an indictment "must be a plain,

concise, and definite written statement of the essential facts constituting the offense charged."

"While detailed allegations might well have been required under common-law pleading rules, . . .

they surely are not contemplated by Rule 7(c)(1)[.]" *United States v. Resendiz-Ponce*, 549 U.S.

102, 110 (2007). Rather, the Third Circuit has stated:

> [A]n indictment [is] sufficient so long as it (1) contains the elements
> of the offense intended to be charged, (2) sufficiently apprises the

> defendant of what he must be prepared to meet, and (3) allows the
> defendant to show with accuracy to what extent he may plead a
> former acquittal or conviction in the event of a subsequent
> prosecution.

*United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) (alterations in original) (internal citations and quotation marks omitted) (quoting *United States v.* Kemp, 500 F.3d 257, 280 (3d Cir. 2007)). "Moreover, 'no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.'" *Kemp*, 500 F.3d at 280 (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)).

Federal Rule of Criminal Procedure 12(b)(3)(B) "permits a criminal defendant to move for the pre-trial dismissal of an indictment as defective if it, *inter alia*, lacks specificity or fails to state an offense." *United States v. Totoro*, Crim. A. No. 15-00291, 2017 WL 3189216, at *2 (E.D. Pa. July 27, 2017) (citing Fed. R. Crim. P. 12(b)(3)(B)(iii), (v)). "A district court may grant a pretrial motion to dismiss an indictment if the indictment's allegations do not suffice to charge an offense." *United States v. Jones*, 299 F. App'x 187, 189 (3d Cir. 2008). "To determine whether an indictment 'contains the elements of the offense intended to be charged,' a district court may look for more than a mere 'recit[ation] in general terms [of] the essential elements of the offense." *Bergrin*, 650 F.3d at 264 (alterations in original) (citation omitted). "A district court must find that 'a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'" *Id.* at 264–65 (citation omitted). Additionally, "if an indictment fails to charge an essential element of the crime, it fails to state an offense." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (citing *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)).

Ordinarily, however, "the court may not predicate such a dismissal upon the insufficiency of the evidence to prove the indictment's charges." *Jones*, 299 F. App'x at 189. "A ruling on a motion to dismiss is not [] 'a permissible vehicle for addressing the sufficiency of the government's evidence.'" *Bergrin*, 650 F.3d at 265 (quoting *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000)). "'Evidentiary questions'—such as credibility determinations and the weighing of proof—'should not be determined at th[is] stage.'" *Id.* (alteration in original) (quoting *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979)); *see also DeLaurentis*, 230 F.3d at 660 ("Unless there is a stipulated record, or unless immunity issues are implicated, a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence.") (citations omitted).

### B.  Decision

Din, joined by Syed, moves to dismiss the Indictment on several grounds. Principally, Din contends the AKS is impermissibly vague and mandates a dismissal of the Indictment because: (1) the HRSA COVID-19 Uninsured Program cannot qualify as a federal health care program (ECF No. 177 at 18); (2) the FAQ seems to "bless[]" the sort of conduct which form the basis of the Indictment (*id.* at 23); and (3) the relationship between Metpath and the marketers should qualify under the bona fide employment relationship safe harbor provision of the AKS (*id.* at 28–29).

First, Din asserts the HRSA COVID-19 Uninsured Program does not constitute a federal health care program under the AKS. (*Id.* at 18.) According to Din, the HRSA COVID-19 Uninsured Program defines an "uninsured individual," in relevant part, as "an individual who is not enrolled in [] a Federal Health care program (as defined under section 1128B(f) of the Social Security Act (42 U.S.C. 1320a-7b(f)))," thereby precluding the HRSA COVID-19 Uninsured Program from qualifying as a federal health care program. (*Id.* at 17–19.) As such, Din argues the Indictment

should be narrowed to exclude all allegations involving claims submitted to and/or paid by the HRSA COVID-19 Uninsured Program. (*Id.* at 18.) Furthermore, because the HRSA COVID-19 Uninsured Program cannot qualify as a federal health care program, the AKS fails under the void for vagueness doctrine as applied to the facts in the case. (*Id.*) Din and Aurangzeb each contend the AKS both fails to provide notice to enable an ordinary person to understand what type of conduct is prohibited (ECF Nos. 173 at 18–24; 177 at 21) and authorizes and encourages arbitrary and discriminatory enforcement of the law (ECF Nos. 173 at 22–24; 177 at 22).

Next, Din asserts policy statements and the FAQ issued by the OIG constitute statutory interpretation that should be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). (ECF No. 177 at 22–23.) Given the FAQ purportedly "blessed" the conduct that forms the basis of the charge against him, Din contends the Indictment must be dismissed as a violation of his due process rights. (*Id.* at 23–24.) He cites to a Sixth Circuit case, *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992), to support his argument that the Court is not limited to the terms of the Indictment and may consider the FAQ as extrinsic evidence in its ruling. (*Id.* at 25–26.) He further asserts the alleged ambiguity of the FAQ renders the AKS vague because it invites speculation as to what constitutes permissible conduct and is unclear regarding the circumstances under which enforcement action is needed. (*Id.* at 26–27.)

Din, joined by Syed, and Aurangzeb argue they should be shielded from immunity by the bona fide employment relationship safe harbor provision. (ECF Nos. 173 at 20; 177 at 28.) They contend the lack of clarity on what constitutes an employment relationship under the AKS merits a dismissal as there is no notice resulting in arbitrary and discriminatory enforcement. (ECF Nos. 173 at 20–21; 177 at 28–31.) Defendants assert the AKS does not explicitly provide a definition of employment and point to varying definitions of employment according to the IRS, the Fair

Labor Standards Act, and several New Jersey statutes, arguing the determination is subjective and can depend on conflicting factors. (ECF Nos. 173 at 21–22; 177 at 28–31.) Aurangzeb also argues the payments to marketers in this case are "both common and innocent" and that his due process rights are violated by this purportedly arbitrary action. (ECF No. 173 at 20.)

In addition to the arguments based on vagueness, Din, joined by Syed, asserts dismissal is needed because the Indictment does not plead an essential element of the charge and cites the wrong statutory provision for the definition of "Federal health care program." (ECF No. 177 at 32–37.) Similarly, Aurangzeb argues mere allegations of "commission payments for marketing services, without more, is beyond the scope of the AKS." Consequently, he claims the Indictment fails to state an offense. (ECF No. 173 at 11.) Din contends the Supreme Court holding in *Ruan v. United States*, 597 U.S. 450 (2022), compels the Government to prove that "paying and accepting commissions, as alleged in the Indictment, was done with the knowledge that the payments were unlawful and not protected by the [bona fide employment relationship] safe harbor." (ECF No. 177 at 32–33.) Aurangzeb states the same. (ECF No. 173 at 14–15.) Aurangzeb further asserts Congress intended to protect commission payments from prosecution under AKS by enacting exceptions like the bona fide employment relationship safe harbor provision, pointing to a statement in the legislative history that emphasizes "the need to recognize that the substance rather than simply the form of a transaction should be controlling." (*Id.* at 15–16.) He also advances the argument that the Government was required, but failed, to allege he had the requisite intent, knowledge, or awareness of the illegality of the payments. (*Id.* at 17.) Din argues the safe harbor provision is an essential element of the offense that should have been charged in the Indictment and thus requires dismissal. (ECF No. 177 at 34.) Din also asserts the Government incorrectly cited 18 U.S.C. § 24(b), which in fact defines "health care benefit program," for the definition of "Federal health

care program." (*Id.* at 35.) As such, Din claims the Government has failed to sufficiently charge an essential element of the offense and the Indictment must be dismissed. He further contends that if the Court deems dismissal inappropriate, the incorrectly cited statute must be stricken from the Indictment as prejudicial surplusage. (*Id.* at 36.)

In opposing Defendants' motions, the Government generally argues the Indictment sufficiently pleads a conspiracy to violate the AKS and disputes that the statute is unconstitutionally vague. (ECF No. 184 at 26.) Citing *Kemp*, 500 F.3d at 280, the Government asserts the Indictment is sufficient and should not be dismissed because it alleges the elements of conspiracy under 18 U.S.C. § 371, tracks the language of the AKS, and includes sufficient factual allegations allowing Defendants to prepare their defenses. (*Id.* at 28.) The Government cites Third Circuit cases in support of its argument that a court must determine the sufficiency of an indictment from its "four corners" and can only grant dismissal if it is deemed "so defective that it does not, by any reasonable construction, charge an offense." (*Id.* (first quoting *Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007); then quoting *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016)).) According to the Government, a motion to dismiss an indictment can only test its legal sufficiency. (*Id.* at 29 (citing *DeLaurentis*, 230 F.3d at 660–61).) Therefore, the Government argues, Defendants' attempt to direct the Court's attention to various documents as extrinsic evidence is improper and contrary to law. (*Id.*) Although Defendants appear to equivocate as to whether their void-as-vagueness argument is facial or as-applied, the Government contends it is neither. (*Id.* at 30.) Arguing the void for vagueness doctrine is narrow and has been routinely rejected by federal courts as a basis for dismissal, the Government asserts the Indictment comports with due process and is not vague because the AKS gives "fair warning that offering or receiving something of value in exchange for referring COVID-19 test samples to Metpath is criminal, [which] is precisely what the Indictment

charges" in detail. (*Id.* at 32–33.) Furthermore, the Government contends "any vagueness concerns are overcome by the higher scienter requirement" in the AKS. (*Id.* at 33.)

Specifically, the Government contests that the HRSA COVID-19 Uninsured Program is not a federal health care program by pointing to an AKS provision defining, in part, a "federal health care program" as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government." (*Id.* at 35–36.) The Indictment, according to the Government, includes considerable factual allegations that establish the HRSA COVID-19 Uninsured Program meets this definition. (*Id.* at 37–39.) The Government further argues the OIG's FAQ does not render the AKS vague as it is an "informal, non-binding guidance document," which the OIG stated, "does not bind or obligate HHS . . . or any other agency." (*Id.* at 40.) Moreover, the Government contends the specific question Din argues would confuse an ordinary person only refers to retail pharmacies and no reasonable person would find it sanctioned payments to individual people as marketers. (*Id.* at 42.) The Government further argues *Levin* is inapposite because it did not involve a violation of the AKS, concerned formal approval letters from a government agency and not informal FAQ, the prosecutors agreed those letters were directly applicable to the defendants, and the court relied in part on the entrapment by estoppel doctrine which calls for factual determinations that the Government argues would be inappropriate at this juncture. (*Id.* at 42–43.)

Furthermore, the Government argues the bona fide employment relationship safe harbor provision is an affirmative defense and not an essential element of the charge. (*Id.* at 45.) The Government cites numerous cases in which courts have held the statutory exceptions to the AKS are affirmative defenses to an alleged violation and that indictments charging an AKS violation need not negate affirmative defenses. (*Id.* at 46–47 (collecting cases).) Additionally, Defendants'

reliance on *Ruan* is unavailing because, according to the Government, a court in the Third Circuit recently rejected the argument that "the Safe Harbor provisions [of the AKS] are now an element of the statute the United States bears the burden of proving beyond a reasonable doubt." (*Id.* at 48 (quoting *United States v. Valentino*, Crim. No. 2-20-cr-00309, ECF No. 199 (E.D. Pa. Sept. 7, 2022)).) Hence, the Government continues, the principle establishing that indictments need not include allegations negating the applicability of affirmative defenses is undisturbed and dismissal on this ground should be denied. (*Id.* at 49.) The Government also contends Defendants mistakenly conflate the Government's burden of proof regarding the requisite *mens rea* at trial versus what an Indictment must allege to overcome a motion to dismiss. (*Id.* at 49.) The Government asserts it will be required to prove the *mens rea* of "knowingly and willfully" at trial and the Indictment's use of this standard is both consistent with the language of the AKS and sufficient to apprise Defendants of the charge and allow them to prepare a defense. (*Id.* at 50–51.)

Lastly, the Government argues a dismissal based on a citation error would be extraordinary and is unwarranted given the Indictment clearly explains the contours of the single charge leveled against Defendants. (*Id.* at 51–52.) The Government says it will move to amend the citation error and remove any reference to 18 U.S.C. § 24(b), which, in any case, the Government argues does not affect the sufficiency of the Indictment. (*Id.* at 53–54.) The Government reiterates its position that the Indictment makes clear the charge being leveled against Defendants, particularly with the amendment removing any reference to the erroneous statutory provision, and that Defendants' efforts to dismiss the Indictment should be rejected. (*Id.* at 55.)

In the Reply, Din, joined by Syed, reiterates each argument. (ECF No. 192 at 4.) First, he contends the canons of statutory interpretation counsel that the narrow definition of "federal health care program" as found in one part of the HRSA COVID-19 Uninsured Program should trump the

14

broad definition provided within the AKS itself. (*Id.* at 5–6.) Din also restates his position that the OIG statements and FAQ "bless the very conduct at issue" and argues the Government does not deny the existence or contents of those statements. (*Id.* at 6–8.) He also contends the legislative history of the AKS establishes that the relationship between Metpath and the marketers was meant to be exempted under the bona fide employment relationship safe harbor provision and that the Government fails to contest this argument. (*Id.* at 9–10.) Din also asserts this district's sister court in the Eastern District of Pennsylvania issued "an incorrectly-decided" opinion in *Valentino* by holding, supposedly against the Supreme Court's holding in *Ruan*, that an AKS "Safe Harbor is an affirmative defense which [the defendant] bears the burden of proof." (*Id.* at 12 (citing *Valentino*, Crim. No. 2-20-cr-00309, ECF No. 199, at 1).) Finally, Din contends the reference in the Indictment to the wrong statutory provision for the definition of federal health care program cannot be corrected by the Government because it is not a mere technical error. (*Id.* at 13.)

Aurangzeb joins in the pre-trial motions and replies of his co-defendants. (ECF No. 194 at 2.) He offers two main arguments in his Reply. (*Id.*) Aurangzeb first reiterates his position that the allegations in the Indictment implicate the bona fide employment relationship safe harbor provision and *Ruan* requires the Government to allege otherwise. (*Id.* at 3–5.) He also repeats his contention that the AKS is unconstitutionally vague as applied to him because "no reasonable person, particularly an immigrant working as a modest salesperson, could be expected to read and understand what is prohibited" given the many statutory exceptions and safe harbors. (*Id.* at 6–7.)

Here, Defendants make several arguments, which, while creative and forcefully conveyed, do not weigh in favor of dismissal. The Court finds the AKS is not unconstitutionally vague, neither facially nor as-applied. Din and Syed attempt to overcome the definition of "federal health care programs" provided *by the AKS itself*. To do so would be to substitute this Court's interpretation

for Congressional intent in drafting the statute and giving its terms meaning. The Court agrees with the Government that the FAQ document is a non-binding document commonly used in the public and private sector to provide general guideposts for staff and the public. It does not constitute a formal commitment on which Defendants can reasonably rely. *See Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d. 1057, 1074–75 (D.N.J. 2011) (explaining interpretive rules, unlike legislative rules, are accorded deference only to the extent they are consistent with statutory prescriptions and "[i]t is unclear that an answer to an FAQ on [a government] website even amounts to an interpretive rule"); *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1147–48 (9th Cir. 2024) (finding FDA FAQ lacked the force of law and would not be subject to deference by the court); *Wood v. Omni Fin. of Nev., Inc.*, 1:22-cv-1148, 2023 WL 3766524, at *20 n.12 (E.D. Va. May 31, 2023) ("Omni provides no source or authority justifying its reliance on nonbinding guidance from the [FAQ]."); *York v. Wellmark, Inc.*, No. 4:16-cv-00627, 2017 WL 11261026, at *11 (S.D. Iowa Sept. 6, 2017) ("[T]he FAQ is entitled to deference only to the extent it has the 'power to persuade' under *Skidmore*.") (internal citations omitted).

However, even assuming the FAQ could be considered an interpretive rule deserving of *Skidmore* deference, the FAQ document only addresses the relationship between laboratories and retail pharmacies and cannot be reasonably construed as implying individuals are permitted to act in a like-manner. There are many reasons why the FAQ could have sanctioned such conduct by retail pharmacies specifically, including that retail pharmacies are complex corporate entities required by law to adhere to rigorous auditing and safety requirements which would not apply to individuals. The FAQ refers only to retail pharmacies as third parties and, consequently, could not lead an ordinary person to believe it "blesse[s]" the sort of conduct in which Defendants allegedly engaged. (ECF No. 177 at 23.) As such, it has no effect on this Court's interpretation of the AKS.

Furthermore, the party claiming an affirmative defense carries the burden of proof, and the Supreme Court's decision in *Ruan* does not counsel otherwise. In *Ruan*, two medical doctors were convicted for dispensing controlled substances without authorization under 21 U.S.C. § 841, which makes it a federal crime, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance," such as opioids. 597 U.S. at 454. The Supreme Court held the clause, "except as authorized," warranted the same legal treatment as an element of the offense—because, among other things, the knowingly and intentionally *mens rea* applies to it and must be proven by the Government—and must be charged in the indictment. *Id.* at 464. Unlike in *Ruan*, in which the "except as authorized" clause was treated like an element of the crime under the statute, here, the bona fide employment relationship safe harbor provision is included under subsection (b)(3) titled "Paragraphs (1) and (2) shall not apply to," and therefore, under the plain meaning of its own terms, is intended to be exempted from the statute. *Id.* The safe harbor provision is separate and apart from any *mens rea* requirement for the crime charged. Moreover, the very question of *Ruan*'s applicability to the AKS was recently taken up by another court in the Third Circuit, which determined "*Ruan* does not apply with equal force to the Anti-Kickback Statute and its [Safe Harbor Provisions,]" finding they are "affirmative defense[s] which [the party claiming them] bears the burden of proving." *Valentino*, Crim. No. 2-20-cr-00309, ECF No. 199, at 3. This Court agrees with this determination and finds no reason to impose on the Government the burden of charging in the Indictment, much less proving at trial, the inapplicability of the bona fide employment relationship safe harbor provision.[5]

---

[5] Defendants' related argument concerning the definition of the terms "employment" or "employee"—namely, that because they are defined in a variety of ways across many statutory schemes, the safe harbor provision and, by consequence, the entire statute, is void-as-vague (ECF Nos. 173 at 21–22; 177 at 28–31)—is unpersuasive. Whereas a vague term prevents conclusive action, the terms "employment" and "employee" can be conclusively defined by determining

Additionally, this Court finds the incorrect citation of 18 U.S.C. § 24(b) in the Indictment for the definition of "federal health care program" is a mere technical error and not a constructive amendment of the Indictment that "create[s] a substantial likelihood that the defendant may be convicted of an offense other than that charged in the original indictment." *United States v. Miller*, 471 U.S. 130, 139–40 (1985); *see also United States v. Abuarqoub*, No. 05-CR-573, 2006 WL 1281482, at *4 (D.N.J. May 5, 2006). The citation is clearly made in error because the correct statutory provision is cited immediately afterwards. This error can be easily corrected by striking all references to 18 U.S.C. § 24(b) for the definition of "federal health care program" from the Indictment. Indeed, the Government concedes the error and offers to correct it, and Din, joined by Syed, asks for this very remedy as an alternative to dismissal.

Accordingly, Defendants' motions to dismiss are **DENIED WITHOUT PREJUDICE**.

**III.    MOTION II – MOTION TO STRIKE ALLEGED SURPLUSAGE**

### A. Legal Standard

A court will strike surplusage from an indictment pursuant to Federal Rule of Criminal Procedure 7(d) when it finds the language is both irrelevant and prejudicial. Fed. R. Crim. P. 7(d); *see United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) (emphasizing Rule 7(d) requires *both* irrelevance *and* prejudice for a court to strike surplusage); *United States v. Weiss*, 588 F. Supp. 3d 622, 632 (E.D. Pa. 2022); *United States v. Lalley*, Crim. A. No. 10-326, 2010 WL 3946659, at *3 (D.N.J. Oct. 5, 2010) (quoting *Hedgepeth*, 434 F.3d at 612). Courts will find information in an indictment to be relevant as long as "it is in a general sense relevant to the overall scheme charged in the indictment." *Lalley*, 2010 WL 3946659, at *3 (quoting *United States v. Giampa*, 904 F. Supp.

---

which among the many available definitions is applicable and simply applying it. Moreover, even assuming the presence of many available definitions would render the terms vague, this still would not invalidate the entire AKS.

235, 271–72 (D.N.J. 1995)); *see also United States v. Goldner*, Crim. A. No. 21-229, 2021 WL 4776340, at *3 (quoting *United States v. Caruso*, 948 F. Supp. 382, 392 (D.N.J. 1996)); *United States v. Holzwanger*, Crim. No. 10-00714, 2011 WL 1741920, at *7 (D.N.J. May 4, 2011) (quoting *Lalley*, 2010 WL 3946659, at *3). A court will only strike surplusage in rare cases. *See United States v. Alsugair*, 256 F. Supp. 2d 306,317 (D.N.J. 2003) (noting the "exacting standard" used to evaluate motions to strike); *Holzwanger*, 2011 WL 1741920, at *7; *United States v. Bortnick*, No. Crim. A. 03-0414, 2004 WL 2861868, at *3 (E.D. Pa. Nov. 30, 2004).

### B. Decision

Din, joined by Syed, requests the Court strike as prejudicial the terms "others" and "kickbacks" from the Indictment. (ECF No. 178 at 37–40.) Din relies on *Alsugair* for his argument that the Court should strike the word "others" because it implies a wider conspiracy than is charged, thereby potentially prejudicing the defendant. (*Id.* at 37–38.) Din also contends the term "kickback" should be struck as prejudicial because the Indictment does not tie any payments to claims to or payments by federal programs and thus "serves no purpose other than to mislead and inflame the jury." (*Id.* at 39.) Din cites two cases from the federal district court in the District of Columbia to argue the term "kickback" is "misleading," too "colorful," and "more accurate words would suffice." (*Id.* at 40 (quoting *United States v. Epsy*, 989 F. Supp. 17, 37 (D.D.C. 1997); *United States v. Hubbard*, 474 F. Supp. 64, 83 (D.D.C. 1979)).) The Government contends both terms are relevant to the offenses charged so the Court need not make a prejudice determination. (ECF No. 184 at 82.) Unlike in *Alsugair*, in which the Government alleges the court held the word "others" should be stricken as surplusage because no other individuals were ever identified as being involved in the scheme alleged, here, the term "others" refers to specific individuals who the Government asserts conspired with Defendants to violate the AKS. (*Id.* at 83.) For example, the

Government points to Tauqir Khan, one of the four individuals charged in the complaint but not indicted as he pled guilty to an Information charging him with engaging in a conspiracy with Metpath. (*Id.*) Moreover, the Government contends the term "kickbacks" is "highly relevant," as it is explicitly used by the AKS and is "the essential theme of the Indictment." (*Id.* at 84.)

Here, the Court finds the words "others" and "kickbacks" should remain in the Indictment, as both terms are relevant to the charge of engaging in a conspiracy to violate the AKS. There are specific individuals—including the four individuals charged in the complaint but not indicted— identified by the Government who may have allegedly conspired with Defendants to violate the AKS, giving the word "others" specific meaning. (*See* ECF No. 184 at 78–79.) Din's reliance on *Alsugair* is unavailing for that reason, as the court in that case removed the references to "others" because it implied a much broader scope of illegal activity than was charged. 256 F. Supp. at 317. In *Alsugair*, the Government specifically named only two other individuals in the indictment who were part of the alleged conspiracy but also referred to "others" without ever supplying names of additional individuals to which the term might refer. *Id.* That is not the case here. Moreover, even if "others" may be prejudicial, it is relevant to proving the existence of a conspiracy and "information that is prejudicial, yet relevant to the indictment, must be included." *Hedgepeth*, 434 F.3d at 612. Furthermore, "kickbacks" is indeed highly relevant as a specific term used in the AKS.

Accordingly, Din and Syed's motion to strike the words "others" and "kickbacks" from the Indictment is **DENIED WITHOUT PREJUDICE**.

## IV.    MOTION III – MOTION TO SEVER

### A.  Legal Standard

The federal judicial system prefers "joint trial of defendants who are indicted together" to "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of

inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). Particularly in conspiracy cases, "joint trials of defendants charged under a single conspiracy aid the finder of fact in determining the 'full extent of the conspiracy' and prevent 'the tactical disadvantage to the government from disclosure of its case.'" *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (citations omitted).

Still, Federal Rule of Criminal Procedure 14(a) provides that a court may sever properly joined defendants, and a defendant seeking such relief bears a "heavy burden in showing prejudice from joinder." *United States v. Hudgins*, 338 F. App'x 150, 153 (3d Cir. 2009). The defendant must demonstrate a joinder would result in a "manifestly unfair trial." *Gov't of the V.I. v. Sanes*, 57 F.3d 338, 341–42 (3d Cir. 1995). It is not enough for the defendant to show he or she would have a greater chance of acquittal if the offenses were tried separately rather than together. *Id.* Once the defendant meets that burden, the Court may exercise its discretion to grant the motion to sever. *See United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005); *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir. 1978). In exercising its discretion, the Court must weigh the potential undue prejudice to the defendant against the interests of judicial economy and any potential undue prejudice to the Government. *United States v. Sandini*, 888 F.2d 300, 305 (3d Cir. 1989).

## B. Decision

Din, joined by Syed, moves to sever his trial from that of Aurangzeb, arguing severance is mandatory. (ECF No. 178 at 25–27.) Specifically, Din objects to the Government's plan to use post-arrest statements in which Aurangzeb discusses Din's involvement in activities alleged to comprise part of the conspiracy. (*Id.* at 25.) Din argues the use of these statements at trial would violate his Sixth Amendment right to cross-examine Aurangzeb because Aurangzeb could refuse to take the stand under his Fifth Amendment right against self-incrimination. (*Id.* at 26.) The

Government responds that Din's motion assumes the statements will be introduced unredacted and in full and is therefore speculative and should be denied without prejudice. (ECF No. 184 at 63.) The Government says it will propose a redacted version of the statements to Defendants that comport with the law at the appropriate time. (*Id.*) In reply, Din argues the Government "minimizes the importance of [his] constitutional rights" by still not identifying the portions of the post-arrest statement it intends to use at trial or "provid[ing] a timeline for when it will do so." (ECF No. 191 at 7.) Din asks the Court to compel the Government to immediately identify the relevant portions. (*Id.* at 7–8.)

Aurangzeb also moves to sever, contending "the gross disparity in the evidence in this case against the defendants weighs in favor of severance." (ECF No. 173 at 24.) He points to significant differences in position, reimbursement amounts, the number of times each defendant is mentioned in the Indictment, and the "more than 20 hours of recordings." (*Id.* at 25.) Aurangzeb claims the jury will not be able to differentiate between the alleged acts of each defendant because the evidence against Syed and Din "will spill over" and prejudice his case. (*Id.* at 26.) He further argues that judicial economy favors severance because his trial, as opposed to that of Din and Syed, would be short and simple. (*Id.*)

The Government responds that Aurangzeb "dramatically overstates the imbalance of evidence," stating it will present evidence at trial showing he was a significant player in the alleged conspiracy. (ECF No. 184 at 58.) The Government also contends the evidence against Syed, Din, and Aurangzeb will overlap considerably (*id.* at 59), counseling in favor of a single trial, and that courts within the Third Circuit have roundly rejected motions to sever based on assertions of more voluminous or damaging evidence against co-defendants (*id.* at 60). The Government further claims separate trials would "needlessly waste judicial and prosecutorial resources" and

disadvantage the Government through early disclosure of its case against subsequent defendants. (*Id.* at 61–62.) Finally, the Government notes that concerns regarding admissibility or potential undue prejudice can be addressed in motions *in limine*, and any prejudicial effect can be cured with appropriate limiting instructions. (*Id.* at 61.) Aurangzeb replies that the Government "'dramatically overstates' the 'overlap' of evidence" between himself and his co-defendants and argues a single trial would be "manifestly unfair." (ECF No. 194 at 8.)

Here, the reasons to sever put forth by Defendants do not overcome the federal system's preference for co-defendants charged in a single conspiracy to be tried together, the Court's interest in judicial economy, or the Government's interest in preventing early disclosure of its cases against each defendant. Din and Syed's arguments concerning the use of Aurangzeb's post-arrest statements against them are unpersuasive in light of the Court's findings regarding the request for hearings to determine the admissibility of certain similar recordings. *See infra* Section II.A.2. At this stage of the case, the Government does not have to disclose which portions of the statements it intends to use at trial. Din has therefore not yet received the statements in the form in which they will be used at trial and merely speculates as to any Sixth Amendment concerns they may pose. Din's concerns, should they arise again, would be better addressed through motions *in limine* or limiting instructions, as the Government rightly pointed out. (ECF No. 184 at 61.) Aurangzeb's claim regarding an alleged "gross disparity in the evidence" is also unavailing because of the overriding interest in confronting the inherent interconnectedness of evidence in conspiracy cases in one trial. (ECF No. 173 at 24.) To assuage Aurangzeb's concerns on this front, if presented in motions *in limine* or through objections at trial, the Court may issue appropriate instructions to the jury to view certain evidence within its proper scope.

Accordingly, Defendants' motions to sever are **DENIED WITHOUT PREJUDICE**.

## V.    MOTION IV – BILL OF PARTICULARS

### A.  Legal Standard

"A bill of particulars is a formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor." *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (citation and quotation marks omitted). Federal Rule of Criminal Procedure 7(f) grants the court the authority to order a bill of particulars where "an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989). It is well-settled a bill of particulars "is not intended to be a discovery device." *United States v. DePaoli*, 41 F. App'x 543, 546 (3d Cir. 2002) (citing *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985)); *see United States v. Coburn*, 439 F. Supp. 3d 361, 387 (D.N.J. 2020) ("[A] bill of particulars is not a general discovery device or a means of obtaining answers to questions the defendant may have."). Rather, a bill of particulars may be required "when the indictment itself is too vague and indefinite" to "adequately apprise the defendant of what he must be prepared to meet." *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012) (citations omitted). Ultimately, Rule 7(f) "does not require the United States Attorney to furnish a three-dimensional colored motion picture of the prosecution's proof prior to trial." *Caruso*, 948 F. Supp. at 395. "[W]hen discovery provided by the Government fills in the outline of the indictment, the necessity for a bill of particulars declines." *United States v. Sourlis*, 953 F. Supp. 568, 578 (D.N.J. 1996).

### B.  Decision

Din, joined by Syed, requests a bill of particulars to address what he claims are deficiencies in the Indictment relating to the alleged kickbacks and "others" with whom Din allegedly conspired. (ECF No. 178 at 27–33.) Specifically, he asks the Court to order the Government to

identify "all payments it alleges violate the AKS[] and the insurance claims to which each payment is tied" (*id.* at 33), as well as the "others" involved in the conspiracy (*id.* at 34). Din contends he requires such precise information in a bill of particulars to effectively prepare his defense because there can be no liability under the AKS without claims tied to a specific federal program. (*Id.* at 30.) Without a bill of particulars, Din states he may have to review many thousands of claims to find the relevant ones. (*Id.*) Din cites several healthcare cases, including AKS case *United States v. Davis*, Crim. A. No. H-14-171S-12, 2014 WL 6679199, at *6 (S.D. Tex. Nov. 25, 2014), to show that courts have granted requests for bills of particular to avoid alleged unfairness in requiring a defendant to "comb through . . . years' worth of reimbursement claims related to . . . thousands of patients in the hopes of identifying the relevant claims." (*Id.* at 31.) Furthermore, Din argues that the identities of the "others" are unclear because he does not know why charges against the four individuals charged in the original complaint alongside himself and Syed were dropped. (*Id.* at 34.) He claims Third Circuit law requires the Government to provide defendants with the identities of co-conspirators unless an identification could endanger the co-conspirators. (*Id.* at 35.)

The Government responds a bill of particulars is unwarranted as the Indictment is "highly detailed" and "Din seeks far more than the law permits." (ECF No. 184 at 69–70.) The Government asserts Third Circuit law holds bills of particulars to be unnecessary where a detailed charging document is supplemented with "substantial discovery," which it alleges (and Din concedes (ECF No. 178 at 27)) is the case here. (ECF No. 184 at 72.) Additionally, the Government argues a bill of particulars may negatively affect its case by limiting the evidence it may submit at trial to what is provided in the bill of particulars (*id.* at 73–74), and by unduly burdening the Government through forcing it to divulge its case before trial and commit to a specific version of events (*id.* at 74). With respect to the alleged kickbacks, the Government asserts it is not required to provide

details for every individual action allegedly taken in a fraud scheme, contending the Indictment and discovery offer sufficient information for trial preparation. (*Id.* at 75–76.) Moreover, the Government argues Din "cites no law that requires more." (*Id.* at 77.) Concerning the "others," the Government alleges Din has "no shortage of information about unindicted persons who conspired with [him] and others" between the Indictment and materials already disclosed in discovery. (*Id.* at 78.) Courts, according to the Government, generally deny requests for bills of particulars where defendants request identifications of co-conspirators. (*Id.* at 79–80.)

In reply, Din argues the Government does not point to where in either the complaint or Indictment it links alleged kickback payments to submissions to and/or payments by federal programs, allegedly underscoring Din's contention that the information on this point is insufficient. (ECF No. 191 at 9–10.) Din also contends the Government mischaracterizes the *Davis* case, which he claims demonstrates the dire need for a bill of particulars in this case. (*Id.* at 10–11.) He further reiterates his inability to identify the "others" and argues he "should not have to wait until trial to learn who his alleged co-conspirators [a]re." (*Id.* at 8.) If the Court will not grant the request for a bill of particulars, Din submits it should strike as prejudicial the terms "kickbacks" and "others" from the Indictment—the subject of a separate motion, *see supra* Section IV. (*Id.* at 11.)

Din and Syed's request for more information about the alleged kickbacks and the "others" in the Indictment is an improper use of a bill of particulars as a discovery vehicle. A bill of particulars is not meant to provide a defendant with specific evidence of the acts alleged in an Indictment. *See United States v. Coburn*, 439 F. Supp. 3d 361, 382 (D.N.J. 2020); *United States v. Delahanty*, Crim. A. No. 21-872, 2022 WL 4237143, at *3 (D.N.J. Sept. 13, 2022) ("[A] bill of particulars is not supposed to furnish to the defense 'each and every document that provides additional information about a criminal charge.'" (quoting *N. Jersey Media Grp., Inc. v. United*

*States*, 836 F.3d 421, 439 (3d Cir. 2016))); *United States v. Menendez*, Cr. No. 15-155, 2015 WL 5703240, at *1 (D.N.J. Sept. 28, 2015) ("A bill of particulars is not meant . . . to require the government to 'weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants.'" (citation omitted)); *Caruso*, 948 F. Supp. at 395 (finding that Rule 7(f) "does not require the [Government] to furnish a three-dimensional colored motion picture of the prosecution's proof prior to trial"). It is sufficient for the Indictment to provide a basic outline of the essential facts for each offense. *See Moyer*, 674 F.3d at 203 (explaining the indictment gave sufficient details where, for example, it identified the type of documents at issue and the range of dates between which they were created); *Delahanty*, 2022 WL 4237143, at *3–4 ("The Indictment here details the events underlying Defendants' deprivation of rights charge. That is, it provides the date and time of the incident, along with facts about [it].") Here, the Indictment is quite detailed, with names of individuals, precise dates and ranges of dates, and approximate amounts of money that would aid in identifying specific transactions, conduct, or actors for a full defense. (*See* ECF No. 94.) At this stage, Din is not entitled to more detail than this.

Moreover, *Davis* does not teach otherwise. The court in *Davis* specifically denied several of the defendant's requests for detailed disclosure of certain acts that violate the AKS. 2014 WL 6679199 at *3. Ultimately, the defendant's request for a bill of particulars was granted only to the extent it supplied the names of individuals whose claims allegedly violated the AKS. *Id.* at *4. The equivalent of that information is already known here—namely, the names of the Defendants themselves, the four individuals charged in the original complaint, and any other names provided in the discovery that has already taken place.

Accordingly, Din and Syed's request for a bill of particulars is **DENIED WITHOUT PREJUDICE**.

VI.  **MOTION V – MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH ALLEGEDLY ABUSED GRAND JURY PROCESS**

### A.  Legal Standard

A prosecutor commits abuse of the grand jury when he or she uses the grand jury to obtain additional evidence against an indicted individual for use at trial. *See In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir. 1980); *United States v. Bressi*, No. 4:19-CR-0207, 2024 WL 4311507, at *2 (M.D. Pa. Sept. 26, 2024). However, "a good faith inquiry into other charges within the scope of the grand jury's lawful authority is not prohibited[.]" *Id.* This is true "even if [the grand jury] uncovers further evidence against an indicted person." *Id.* Indeed, "the law presumes, absent a strong showing to the contrary, that a grand jury acts within a legitimate scope of its authority[.]" *Bressi*, 2024 WL 4311507, at *2 (citing *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991)). A person seeking to suppress evidence on these grounds must "demonstrate that the sole or dominant purpose of seeking the evidence post indictment is to prepare for the pending trial." *In re Grand Jury Proceedings*, 632 F.2d at 1041; *see United States v. Chu*, Crim. No. 19-cr-0678, 2021 WL 5997985, at *3 (D.N.J. Dec. 20, 2021).

### B.  Decision

Din, joined by Syed, requests the Court suppress all materials obtained by the grand jury in violation of the grand jury process. (ECF No. 178 at 40–41.) He argues the Government abused the grand jury process when it issued subpoenas to unindicted individuals after the Indictment was returned. (*Id.*) The Government contends the Court should not suppress this evidence because the subpoenas were lawfully issued to investigate other individuals and other crimes, not to gather additional evidence against Din for use at trial. (ECF No. 184 at 84–85.) The Government also offered to submit an *ex parte* letter to the Court providing detailed explanations for issuing the subpoenas, including the identifies of the individuals who were being investigated. (*Id.* at 85.) In

his Reply, Din asks the Court to hold the Government to its offer to submit the *ex parte* letter and to evaluate its contents to ensure the grand jury process was not abused to improperly gather evidence against Din. (ECF No. 191 at 11.)

Din does not meet the high burden necessary to suppress grand jury evidence. His argument relies solely on the post-indictment timing of the subpoenas. (ECF No. 178 at 41.) Even assuming Din is correct that the grand jury continued to investigate him, it was free to do so; a grand jury may investigate simply to "satisfy itself that [no crime] has occurred." *R. Enters.*, 498 U.S. at 297. The fact that no superseding indictment was issued against Din suggests the grand jury did not target him. Din speculates, based solely on the timing of the subpoenas, the post-indictment subpoenas issued against others were intended to gather evidence *against him*; indeed, they may well be entirely unrelated to his case.

Accordingly, Din and Syed's motion to suppress grand jury evidence is **DENIED WITHOUT PREJUDICE**. The Government shall submit an *ex parte* letter with detailed explanations for issuing the subpoenas to unindicted individuals within two weeks of this Opinion.

## VII.    MOTION VI – MOTIONS TO COMPEL

### A. Production of Material Under *Brady, Giglio*, Fed. R. Evid. 404(b), and Fed. R. Crim. P. 16, Including Agents' Rough Notes and Reports

#### 1. Legal Standard

##### a. *Brady*

*Brady* material, which consists of evidence in the Government's possession that would tend to exculpate Defendant, must be disclosed "in time for its effective use at trial." *United States v. Jafari*, Crim. No. 12-475, 2012 WL 5335242, at *2 (D.N.J. Oct. 26, 2012) (quoting *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984)); *see also United States v. Johnson*, 218 F. Supp. 3d 454, 459 (W.D. Pa. 2016) (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983)); *United*

*States v. Blackwell*, 954 F. Supp. 944, 968 (D.N.J. 1997). Although the timely disclosure of *Brady* material is judged on a case-by-case basis, courts have held disclosure of one to two weeks before trial to be sufficient. *See Johnson*, 2012 WL 5335242, at *2 (ordering Government to produce *Brady* material no later than ten days before trial); *United States v. Thompson*, Crim. A. No. 17-00094, 2019 WL 102413, at *8 (D.N.J. Jan. 4, 2019) (declining to make further order on discovery based on Government's voluntary commitment to disclose *Brady* evidence at least seven days before trial); *United States v. Beech*, 307 F.R.D. 437, 442–43 (W.D. Pa. 2015) (ordering Government to disclose *Brady* material no later than ten business days before trial).

The Government is generally expected to preserve rough notes of interviews pertaining to the case. *See United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994); *United States v. Vella*, 562 F.2d 275, 275–76 (3d Cir. 1977). Interview notes are subject to disclosure only to the extent they contain exculpatory *Brady* material or Jencks Act material concerning impeachment. *See United States v. Edwards*, No. 2:20-cr-00572, 2024 WL 1620311, at *8 (D.N.J. Apr. 15, 2024); *United States v. Chrysanthopoulos*, Crim. No. 12-672, 2013 WL 4833563, at *3–4 (D.N.J. Sept. 10, 2013); *United States v. Glenn*, Crim. No. 15-99-1, 2018 WL 4091786, at *8–9 (E.D. Pa. Aug. 24, 2018). Courts do not specifically order the Government to preserve rough notes when the Government otherwise indicates it is aware of its legal obligation to do so. *See United States v. Miller*, Case No. 15-202, 2016 WL 1408102, at *5 (D.N.J. Apr. 11, 2016) (denying motion for Government to preserve rough notes as moot when Government indicated it was aware of obligation to preserve and disclose such notes); *United States v. Stiso*, Crim. No. 14-484, 2015 WL 5666137, at *9 (D.N.J. Sept. 25, 2015) (same); *United States v. Rodriguez*, Crim. No. 20-01064, 2022 WL 1058380, at *6 (D.N.J. Apr. 8, 2022) (same).

### b.  *Fed. R. Crim. P. 16*

Federal Rule of Criminal Procedure 16 requires the Government to produce to defendants:

> (1) documents within the government's possession, custody, or control when the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial; [and]
>
> (2) reports of examinations and tests if the item is within the government's possession, custody, or control, government counsel knows or through due diligence could have known the item exists, and the item is material to preparing the defense or the government intends to use the item in its case-in-chief.

*United States v. Estrada*, Crim. A. No. 21-429, 2022 WL 462090, at *3 (D.N.J. Feb. 14, 2022) (citing *United States v. Roberts*, 419 F. App'x 155, 159 (3d Cir. 2011)). Evidence is material where there is a "strong indication that [it] will play an important role in uncovering admissible evidence, aiding witness preparation . . . or assisting impeachment or rebuttal." *Id.* (quoting *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996)). Defendants carry the burden of demonstrating materiality. *See id.; United States v. King*, Crim. No. 19-cr-257, 2021 WL 4441514, at *2 (D. Colo. Sept. 28, 2021); *see also United States v. Philip*, 948 F.2d 241, 250 (6th Cir. 1991).

### c.  *Fed. R. Evid. 404(b), Giglio, and the Jencks Act*

The Court typically determines the dates for disclosure of evidence under Rule 404(b), *Giglio*, and the Jencks Act after a final pre-trial conference between the parties. *See Edwards*, 2024 WL 1620311, at *3; Standing Order 15-2 – Criminal Trial Scheduling & Discovery ¶ 19. The Government is required to provide "reasonable notice" of Rule 404(b) evidence to the defendant, which courts have defined as seven to ten days before jury selection for trial. Fed. R. Evid. 404(b)(3)(A); *see United States v. Tilton*, Crim. No. 20-30, 2020 WL 4188128, at *3 (D.N.J. July 21, 2020); *United States v. Tejada*, Crim. No. 12-312, 2013 WL 3786299, at *6 (D.N.J. July 17, 2013) (ordering disclosure of Rule 404(b) evidence "not less than ten (10) calendar days prior to

the date of trial"); *Rodriguez*, 2022 WL 1058380, at *7 (ordering disclosure of Rule 404(b) evidence "one week prior to the trial start date in this matter"). Pre-trial hearings regarding the admissibility of Rule 404(b) evidence are usually scheduled only after the Government has indicated its intention to use such evidence. *See United States v. Hassan-Gouda*, Crim. No. 07-258, 2013 WL 1501695, at *6 (D.N.J. Apr. 8, 2013); *United States v. Royster*, Crim. No. 21-00251, 2022 WL 2274477, at *4 (D.N.J. June 23, 2022); *United States v. Manning*, Crim. No. 14-326, 2015 WL 1310286, at *3 (D.N.J. Mar. 24, 2015).

Prosecutors are duty bound to "disclose evidence that goes to the credibility of prosecution witnesses." *Giglio v. United States*, 405 U.S. 150, 154 (1972). This obligation only extends to witnesses who will testify at trial. *See Buehl v. Vaughn*, 166 F. 3d 163, 181 (3d Cir. 1999). Because such evidence is used on cross-examination to challenge the credibility of government witnesses, it can be produced on the day the government witness is testifying without undermining the defendant's right to a fair trial. *Higgs*, 713 F.2d at 44; *see also Miller*, 2016 WL 1408102, at *4 (stating the court cannot require the pre-trial production of *Giglio* material). Ultimately, defendants are not legally entitled to pre-trial disclosure of *Giglio* or Jencks Act material. *See Tejada*, 2013 WL 3786299, at *5–6; *Miller*, 2016 WL 1408102, at *4; *Tilton*, 2020 WL 4188128, at *2–3. Testifying informants are treated the same as other witnesses and their identities are to be included in the Government's *Giglio* and Jencks Act disclosures. *See Edwards*, 2024 WL 1620311, at *9; *United States v. Gatson*, Crim. No. 13-705, 2014 WL 7182275, at *26 (D.N.J. Dec. 15, 2014) ("Testifying co-conspirators and confidential informants are treated no differently than other witnesses."); *United States v. Griffith*, 598 F. Supp. 3d 221, 240–41 (M.D. Pa. 2022) (noting the Government must eventually disclose impeachment material regarding testifying informants to a defendant); *United States v. Coles*, 511 F. Supp. 3d 566, 583–84 (M.D. Pa. 2021) (agreeing with

defendant "that he is entitled to any exculpatory or impeachment material relating to the government's jailhouse-informant witnesses").

In the case of non-testifying informants, the Defendant must show a "specific need for disclosure" of the identities of these informants, because, for instance, the information would be "essential to a fair determination of his guilt." *Gatson*, 2014 WL 7182275, at *26 (quoting *United States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002)); *see also Tejada*, 2013 WL 3786299, at *7–8 ("It is well settled that '[a] defendant in a noncapital case does not have a right to discover a list of prospective Government witnesses.'" (alteration in original) (quoting *United States v. Eisenberg*, 773 F. Supp. 662, 683 (D.N.J. 1991))); *Rodriguez*, 2022 WL 1058380, at *6 (denying defendant's motion to order disclosure of identity of confidential Government informant because "the identity of this informant is not 'essential to a fair determination of a cause'" (quoting *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957))).

### 2. Decision

Din, joined by Syed, moves the Court to compel immediate disclosure of all evidence under *Brady* and Fed. R. Crim. P. 16, arguing such evidence is needed sufficiently ahead of trial to allow him to prepare his defense. (ECF No. 178 at 41.) He likewise requests production of *Giglio* and Fed. R. Evid. 404(b) material at least eight weeks before trial and a court order requiring the Government to preserve all agents' rough notes concerning this matter. (*Id.* at 45.) Finally, Din moves to compel the Government to immediately disclose any expert witnesses whose testimony would be subject to Fed. R. Evid. 702, along with accompanying expert reports and resumes. (*Id.* at 46.)

Aurangzeb also moves to compel the Government to disclose all exculpatory materials under *Brady* and *Giglio*, arguing he is entitled to them "as a matter of right." (ECF No. 173 at 27.)

He further requests an order compelling the Government to immediately describe all Fed. R. Evid. 404(b) evidence it intends to use at trial (*id.* at 28–29) and disclose all material concerning witnesses under the Jencks Act and Fed. R. Crim. P. 26.2, arguing this would expedite trial (*id.* at 31–32). Finally, Aurangzeb requests the Court require the Government to preserve three categories of documents: "(1) contemporaneous rough notes taken by government agents of meetings, conversations or interviews during the course of its investigation; (2) the agent's subsequently prepared drafts of their reports of these incidents and (3) the final reports signed by the agents." (*Id.* at 33.) He argues these materials may be critical to impeach any witnesses. (*Id.* at 34.)

The Government replies it is aware of its obligations under *Brady*, *Giglio*, Fed. R. Crim. P. 16, and Fed. R. Evid. 404(b), and states it will make a prompt disclosure "[s]hould any exculpatory material come into the Government's possession" and "in accordance with the forthcoming trial scheduling order," as relevant. (ECF No. 184 at 86–88.) Additionally, the Government commits to voluntarily producing Jencks material pursuant to the forthcoming trial scheduling order and at least one week before trial. (*Id.* at 87.) In turn, the Government requests similar disclosures from Defendants. (*Id.*) Regarding agent rough notes and reports, the Government likewise states it is aware of its obligations and has preserved such documents, arguing the motion should be dismissed as moot. (*Id.* at 89.) To the extent prosecutors uncover any material impeachment information in the documents, the Government argues it would submit those materials under an appropriate court order for *in camera* review and possible disclosure to the defense. (*Id.* at 89–90.)

Syed separately moves for the prompt production of all *Brady* material for purposes of investigating why the four individuals charged in the original complaint were not included in the Indictment. (ECF No. 171 at 12–13.) He claims these *Brady* materials may be favorable to his defense and must be produced. (*Id.* at 21.) Syed also moves for the prompt production of all *Giglio*

material for purposes of investigating the differences between the original complaint and the Indictment. (ECF No. 171 at 12–13.) He contends this material may be favorable to his defense and must be produced. (*Id.* at 21.) The Government argues Syed is not entitled to information about decisions within its prosecutorial discretion and he has not demonstrated any information concerning the four individuals is either material or exculpatory to his case. (ECF No. 184 at 98.) The Government represents it understands its obligations under *Brady* and *Giglio* and will continue to comply with them. (*Id.*) In reply, Syed argues these materials would reveal details of the conspiracy alleged by the Government relating to the individuals named in the complaint which may be material to Syed's guilt or innocence. (ECF No. 193 at 9–10.)

Here, each Defendant argues he is generally entitled to *Brady* and Fed. R. Crim. P. 16 evidence, which indeed they both are, and do not contend the Government has withheld any such evidence. (ECF Nos. 173 at 27–28; 178 at 41–45.) Regarding Syed's motions, the Government acknowledges it must produce all *Brady* and *Giglio* materials to the defense and has said that it will do so at the appropriate time. (ECF No. 184 at 86–88.) Consequently, as the Government has expressed its commitment to disclose evidence under *Brady* and Fed. R. Civ. P. 16, and neither Din nor Aurangzeb has argued any such evidence has been wrongfully withheld, the Court sees no reason to issue an order compelling immediate disclosure. The Court finds the Government's commitment to disclosure of materials under *Brady* and Fed. R. Civ. P. 16, including the preservation of agent rough notes and reports, sufficient at this stage. *See Edwards*, 2024 WL 1620311, at *11 (collecting cases). Moreover, Defendants are not legally entitled to pre-trial disclosure of material under *Giglio* or the Jencks Act. *See id.* Additionally, as a final pre-trial conference has not yet taken place, there is ample time for Aurangzeb to have "reasonable notice" of Rule 404(b) evidence. Fed. R. Evid. 404(b)(3)(A).

Accordingly, based on the Government's knowledge of its obligations and representations of compliance, Defendants' motions to compel production of materials pursuant to *Brady*, *Giglio*, Fed. R. Crim. P. 16, Fed. R. Evid. 404(b), and the Jencks Act, including preservation of agent rough notes and reports, are **DENIED WITHOUT PREJUDICE**.

### B. Grand Jury Transcripts

#### 1. Legal Standard

Federal Rule of Criminal Procedure 6(e) protects the secrecy of grand jury proceedings. Fed. R. Crim. P. 6(e)(3)(E). Despite this presumption of secrecy, disclosure of a grand jury transcript may be appropriate when a defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The party requesting disclosure bears the burden of showing "a particularized need for that information which outweighs the public interest in secrecy." *United States v. Minerd*, 299 F. App'x 110, 111 (3d Cir. 2008) (quoting *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989)). "Mere speculation that improprieties may have occurred will not suffice." *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972). According to the Supreme Court, a party seeking disclosure of a grand jury transcript must demonstrate that "a defense would be greatly prejudiced or that without reference to it an injustice would be done." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 221 (1979).

#### 2. Decision

Syed moves to compel disclosure of the grand jury transcripts pursuant to Fed. R. Crim. P. 6(e)(3)(E) for purposes of investigating why four individuals charged in the original complaint were not included in the Indictment. (ECF No. 171 at 12–13.) Syed contends the discrepancies between the complaint and the Indictment resulted in a "hodgepodge Indictment that fails to

identify a single conspiracy." (*Id.* at 13.) As such, Syed argues the Indictment "suffers from fatal *Kotteakos* problems" and claims the requested materials could either exonerate or exculpate him of the AKS charge. (*Id.* at 16 (citing *Kotteakos v. United States*, 328 U.S. 750 (1946).) Syed further claims the need for secrecy over the grand jury proceedings has decreased considerably because the complaint made public the identities of the four individuals and the grand jury has since concluded its work. (*Id.* at 19.)

The Government responds that Syed fails to show a particularized and compelling reason to obtain the grand jury transcripts because his argument relies on speculation concerning the reasons individuals were dropped from the case. (ECF No. 184 at 94–95.) The Government also claims the transcripts relate only to the Indictment and therefore could not "shed any light on variances between the complaint and Indictment." (*Id.* at 92.) Additionally, the Government argues the Indictment "clearly" alleges a single conspiracy among Defendants and thus does not present a multi-dimensional *Kotteakos* issue. (*Id.* at 96.) Even if Syed were given the transcripts, the Government asserts they would offer no information about the conspiracy alleged in the complaint, which the Government insists has no bearing on a *Kotteakos* analysis. (*Id.* at 96–97.)

Here, Syed requests the grand jury transcripts to uncover the reasons why the Government did not pursue charges against the four individuals named in the complaint, believing those reasons will exonerate or exculpate him as well. (ECF No. 171 at 12–13, 16.) But this, as the Government rightly contends, is entirely speculative. It is well established that "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Moreover, "the decision to prosecute is particularly ill-suited to judicial review," as there is indeed a myriad of reasons behind why, how, and against whom the Government chooses to prosecute a case. *Id.* The

reasons may have no bearing on Syed's defense at all, and his conjectures fall short of showing a compelling need for the transcripts. Granting Syed's request would also be fruitless because the transcripts could not provide Syed with the answers he seeks regarding differences between the complaint and Indictment as they only relate to the latter. Because Syed fails to demonstrate the requisite need for the transcripts, the Court need not address the parties' remaining arguments.

Accordingly, Syed's request for the grand jury transcript is **DENIED WITHOUT PREJUDICE**.

### VIII.    MOTION VII – ADMISSIBILITY, AUDIBILITY, AND *FRANKS* HEARINGS

#### A.    Admissibility & Audibility Hearings of Audio, Video, and Tape Recordings

##### 1.    Legal Standard

Federal Rule of Evidence 901 obligates the Government to establish a proper foundation for any recordings offered into evidence. In *United States v. Starks*, the Third Circuit held "[w]hen a colorable attack is made as to a [recording's] authenticity and accuracy, the burden on those issues shifts to the party offering the [recording]," who must then "prove its chain of custody." 515 F.2d 112, 122 (3d Cir. 1975); *Gatson*, 2014 WL 7182275, at *26.

##### 2.    Decision

Din, joined by Syed, requests the Court conduct a hearing to review each recording made by the cooperating witness ("CW") that the Government intends to introduce at trial to determine its admissibility. (ECF No. 178 at 18.) He argues the recordings are largely unintelligible and otherwise appear to have been altered by omitting either the beginning or the end of certain recordings. (*Id.* at 18–22.) Din also claims one particular recording, which the Government admits exists, has been improperly withheld. (*Id.* at 22–23.) Like Din, Aurangzeb requests the Court hold

a hearing to determine the audibility and admissibility of the various recordings, primarily arguing there are "inaudible portions" that "render the recording[s] untrustworthy." (ECF No. 173 at 32.)

The Government responds the Court should dismiss these requests as it has not yet identified which of the dozens of recordings, or portions therein, it will move to introduce at trial. (ECF No. 184 at 64.) The Government insists the recordings are largely audible and have not been altered (*id.* at 65–67), noting it has turned over all relevant recordings in their original formats (*id.* at 64). Ultimately, the Government contends the request for a hearing is meritless, premature, and unnecessary. (*Id.*) In turn, the Government requests dates for identifying the recordings it intends to use at trial as well as the dates for admissibility hearings, if contested, be added by the Court to the trial scheduling order. (*Id.* at 64–65.)

In his Reply, Din asks the Court to compel the Government to timely identify which recordings it intends to use at trial, noting "the Government has had approximately 635 days since [the] Indictment to decide what recordings . . . it intends to use." (ECF No. 191 at 5 (emphasis omitted).) He also requests the Court schedule a *Starks* hearing to determine the admissibility of those recordings based upon the audibility and incompleteness concerns he raised. (*Id.*) Moreover, Din contends the Government's assertion that the FBI's recording devices were unable to record a streamlined post-arrest statement for Aurangzeb, but rather in 36 clips, "seems incredible" and necessitates a hearing to determine the credibility of this assertion. (*Id.* at 6–7.)

Here, as the Government has yet to identify those recordings which it will seek to utilize at trial, a *Starks* hearing is indeed premature. However, the Court agrees that the Government has had ample time to choose which of the recordings it possesses it will seek to introduce at trial and notify Defendants. Judicial economy counsels in favor of timely identification so that necessary hearings may soon be held.

Accordingly, Defendants' requests for hearings regarding the audibility and admissibility of audio, video, and tape recordings is **DENIED WITHOUT PREJUDICE**. The Government shall identify the recordings it seeks to use at trial within two weeks of this Opinion, and any admissibility hearings will be scheduled as needed.

### B.   Hearing Regarding Admissibility of Co-Conspirator Statements

#### 1.   Legal Standard

Pre-trial hearings to determine the admissibility of co-conspirator statements are generally not required in the Third Circuit. *See Tejada*, 2013 WL 3786299, at *4 ( "[T]he Third Circuit has consistently upheld the district court's exercise of discretion in conditionally admitting co-conspirator statements at trial subject to subsequent presentation of evidence establishing the existence of a conspiracy."); *United States v. Abreu*, Crim. No. 20-00642, 2021 WL 3561247, at *13 (D.N.J. Aug. 12, 2021) ( "[T]he Third Circuit does not require district courts to hold a pre-trial hearing to determine the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E)."); *United States v. Savage*, Crim. Nos. 07–550–03, 07–550–04, 07–550–05, 07–550–06, 2012 WL 5866068, at *3 (E.D. Pa. Nov. 20, 2012) ("[Such] hearings are neither required, nor a procedure that is often used in the Third Circuit.").

#### 2.   Decision

Aurangzeb moves for a hearing to determine whether co-conspirator statements the Government may seek to introduce at trial are admissible under Fed. R. Evid. 801(d)(2)(E). (ECF No. 173 at 26–27.) The Government argues his request is premature because it has not yet identified which statements, or portions thereof, it will seek to utilize at trial. (ECF No. 184 at 64.) Instead, the Government requests the Court issue a trial scheduling order setting a date by when recordings should be identified and a date for admissibility hearings. (*Id.* at 65.)

Here, Aurangzeb seeks to put any co-conspirator statements through a filter to ensure any such remaining statements pertain to and were made in furtherance of the alleged conspiracy. However, this is the goal of all evidence presented at trial: to prove the charge(s) against a defendant. He has given no reason why a pre-trial hearing on the admissibility of co-conspirator statements is needed in lieu of letting the Government offer its proofs in the ordinary course of events. Adding to this is the fact that such hearings are not required in this Circuit. *See Tejada*, 2013 WL 3786299, at *4; *Abreu*, 2021 WL 3561247, at *13; *Savage*, 2012 WL 5866068, at *3. As such, the Court sees no reason to grant Aurangzeb's request.

Accordingly, Aurangzeb's motion for a pre-trial hearing on the admissibility of co-conspirator hearsay statements is **DENIED WITHOUT PREJUDICE**. The Government shall identify the statements and/or portions thereof it seeks to use at trial within two weeks of this Opinion, and any admissibility hearings will be scheduled as needed.

### C. *Franks* Hearing

#### 1. Legal Standard

Federal Rule of Criminal Procedure 41(h) provides "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides." Rule 12 requires suppression motions be made prior to trial. Fed. R. Crim. P. 12 (b)(3)(C).

The Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231 (2011). "The Fourth Amendment forbids 'unreasonable searches and seizures,' and this usually requires the police to have probable cause or a warrant before making an arrest." *Herring v. United States*, 555 U.S. 135, 136 (2009). "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a

41

particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[A] defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (citations omitted). "The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated." *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)).

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission) in a search-warrant affidavit." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012) (citing *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006)).

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). A defendant is entitled to a *Franks* hearing "only if he (1) made a 'substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) showed that the false statements or omitted facts were 'necessary to the finding of probable cause.'" *Pavulak*, 700 F.3d at 665 (quoting *Yusuf*, 461 F.3d at 383–84). "A *Franks* hearing is appropriate where a defendant alleges material omissions in a warrant, rather than an affirmative falsity" and is granted in "rare instances." *United States v. Harper*, Case No. 2:20-cr-00806, 2021 WL 3856190, at *7 (D.N.J.

Aug. 26, 2021) (quoting *United States v. Meehan*, Crim. A. No. 11-440, 2013 WL 1875821 at *5 (E.D. Pa. May 3, 2013)).

### 2. Decision

Syed requests the Court hold a *Franks* hearing to determine whether evidence that purportedly supported a theory the Government has since abandoned caused the magistrate judge to find probable cause where no such finding would have been made. (ECF No. 170 at 12.) The Government responds that Syed fails to make a substantial preliminary showing any that facts were omitted, or inaccuracies were made with knowledge or recklessness. (ECF No. 184 at 100–03.) Moreover, even if Syed made the requisite preliminary showing, the Government argues he does not demonstrate any such information was necessary to finding probable cause. (*Id.* at 103–05.) Syed reiterates his request for a *Franks* hearing is warranted to uncover the rationales behind the Government's change in direction and evaluate "whether the Government's progression of theories . . . amounts to recklessness." (ECF No. 193 at 16.)

Here, Syed has not made a showing of any false statements or omissions knowingly or recklessly made and is therefore not entitled to a *Franks* hearing. At most, he alleges the change in the Government's theory of the case from the complaint to the Indictment might "amount[] to recklessness." (*Id.*) However, Syed offers only rhetorical questions and conjecture as support and has not pointed to any specific statements or omissions. This Court has previously found a *Franks* hearing unwarranted in a case in which a defendant alleging mischaracterization of a certain fact as well as an alleged omission because neither was material or necessary to the finding of probable cause. *See Harper*, 2021 WL 3856190, at *6–8. Syed provides no such specificity and thus fails to show an entitlement to a *Franks* hearing.

Accordingly, Syed's motion for a *Franks* hearing is **DENIED WITHOUT PREJUDICE**.

IX.    **MOTION X – MOTIONS FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Defendants request permission to file additional pre-trial motions as needed. (ECF Nos. 173 at 35; 178 at 46.) Defendants' motions are **GRANTED**.

X.    **CONCLUSION**

For the reasons set forth above, and for good cause having been shown, Defendants' Motions (ECF Nos. 170–71, 173, 177–78) are **GRANTED** in part and **DENIED** in part. An appropriate order follows.


Date: February 27, 2025                              */s/ Brian R. Martinotti*
                                                     **HON. BRIAN R. MARTINOTTI**
                                                     **UNITED STATES DISTRICT JUDGE**